UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
SHEMA KOLAINU-HEAR OUR VOICES,

       Plaintiff,                <u>MEMORANDUM AND ORDER</u>

  -against-                  Civil Action No.
                               09-CV-3140(DGT)

PROVIDERSOFT, LLC,

       Defendant.

--------------------------------X


Trager, J:

    Shema-Kolainu-Hear Our Voices ("SK-HOV" or "plaintiff")
brings this action against ProviderSoft, LLC ("ProviderSoft" or
"defendant") for damages surrounding a software licensing
contract between the two organizations.  Although SK-HOV does
not assert a direct breach of contract claim, it argues that the
contract as written should be held unconscionable and that
ProviderSoft fraudulently obtained its participation in the
agreement.  SK-HOV's complaint asserts claims of: (1) breach of
implied warranty of merchantability, implied warranty of fitness
for a particular purpose and express warranty; (2) violation of
New York General Business Law § 349; (3) strict product
liability; (4) gross negligence; (5) negligence and (6) fraud in
the inducement.  Jurisdiction is premised on diversity under 28
U.S.C. § 1332.

Defendant has moved to dismiss all of plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons stated below, defendant's motion is granted in part and denied in part.

**Background**

**(1)**

The following facts are taken from the complaint and, for the purposes of this motion, are presumed to be true.  SK-HOV is a New York educational, not-for-profit corporation that provides therapeutic services to children suffering from autism spectrum disorders and other disabilities.  Compl. ¶ 4.  SK-HOV works primarily with clients obtained under the auspices of programs run by the City of New York ("the City"), in particular the City's Early Intervention Program ("EI").  Id. at ¶ 8.  EI has "highly detailed and specific requirements" for its billing system, including the designation of some services that must be billed on-line through a company chosen by the City, and other services that must be billed in paper format.  Id. At the time of the underlying dispute, the City used the company Covansys for its on-line billing.  Id.

Beginning in the summer of 2007, plaintiff sought a new computer software and billing system that could help it comply with the complicated billing requirements of EI in "an accurate

and complete manner," and could also perform other "critical functions," including keeping track of plaintiff's clientele, the amounts billed for services and payments rendered by the City.  Id. at ¶ 9.

In its search for a new software provider, SK-HOV encountered Providersoft, a New Jersey limited liability company that creates and licenses software systems.  Id. at ¶ 5. Providersoft maintains a website where it advertises its "Providersoft EI" system, which is marketed to EI agencies – such as SK-HOV – as providing "state of the art Covansys Interface for EI Billing."  Id. at ¶ 10 and Ex. A.  The website explains that Providersoft EI will "[a]llow your organization to empower your contract or employee service providers to reach a previously unimaginable level of organization, compliance and commitment to your clients and company."  Id. at ¶ 11 and Ex. B.

SK-HOV representatives met with Providersoft representatives on several occasions, beginning in August 2007, to discuss whether Providersoft EI might fit SK-HOV's software needs.  Id. at ¶ 12.  At these meetings, Providersoft representative Mark Shaw ("Shaw") made several statements to SK-HOV about the capabilities of Providersoft EI, including that the software would be "100% compliant with EI regulations regarding double billing" and that the software offered billing

protections that would not allow SK-HOV to overbill inadvertently.  Id.

Plaintiff alleges that, relying upon Shaw's representations, it entered into a licensing agreement with defendant on October 16, 2007, wherein plaintiff agreed to pay a monthly fee in exchange for the use of defendant's EI software (the "contract").  Id. at ¶ 13 and Ex. C.  The contract, effective December 1, 2007, included the following disclaimer of warranty:

> ALL LICENSED SOFTWARE SERVICES, LOGIN
> ACCESS, PRODUCTS, INFORMATION, CUSTOM
> SOFTWARE, DOCUMENTATION, MAINTENANCE
> SERVICE, AND OTHER SERVICES AND MATERIALS
> PROVIDED UNDER THIS AGREEMENT ARE PROVIDED
> "AS IS" WITHOUT ANY EXPRESSED OR IMPLIED
> WARRANTY OF ANY KIND, INCLUDING WARRANTIES
> OF MERCHANTABILITY, NON-INFRINGEMENT OF
> INTELLECTUAL PROPERTY, OR FITNESS FOR ANY
> PARTICULAR PURPOSE.

Id. at Ex. C § 7.2.

Unfortunately, defendant's software did not prove to be satisfactory for SK-HOV's needs.  SK-HOV alleges numerous flaws in Providersoft EI, including electronic billing of some services required by EI to be billed in paper form, erroneous data management, false reports of bills having been submitted, double billing for some services and several other problems tracking services and making payments.  Compl. ¶ 14.  Plaintiff also more generally claims that the system lacked reasonable

basic functions. Id. These alleged defects resulted in significant financial harm to plaintiff. Id. at ¶ 15. EI requires that all bills be submitted within ninety days of services; thus, many bills that were submitted late due to the alleged flaws in defendant's software were denied as untimely. Id. Moreover, some improper billings resulted in overpayment to plaintiff, "potentially exposing plaintiff to delisting from the EI program or worse legal consequences." Id. Furthermore, these mistakes required hiring additional employees as well as enlisting plaintiff's regular employees to expend "thousands of hours" to correct the errors. Id. Plaintiff repeatedly notified defendant of these averred defects but defendant took no action and denied that there were any errors in its software, instead alleging that any errors were due to bad data entry or the inexperience of plaintiff's employees. Id. at ¶ 16.

It is unclear how long plaintiff continued to use defendant's software or whether the relationship between the parties has now ended. The contract provided an initial term of thirty-six months commencing in December 2007, which would make the agreement still effective unless terminated by one of the parties. See id. at Ex. C § 6.1. The contract did permit termination by SK-HOV in the event of a breach by ProviderSoft after providing notice and opportunity to cure. Id. § 12.1. However, there is no mention in any of the papers of whether SK-

HOV ever attempted to exercise this right, and SK-HOV is not now claiming breach of contract.

Instead, SK-HOV is proceeding against ProviderSoft under a number of alternative theories. First, SK-HOV claims breach of implied warranty of merchantability, implied warranty of fitness for a particular purpose and express warranty. Next, it asserts a claim that ProviderSoft's behavior violates New York's Deceptive Acts and Trade Practices Law, N.Y. Gen. Bus. Law § 349. Finally, SK-HOV asserts tort claims of strict product liability, gross negligence, negligence and fraud in the inducement. Defendant has moved to dismiss all of these claims for failure to state a claim under Fed. R. Civ. P. 12(b)(6). For the reasons explained below, defendant's motion is denied with respect to plaintiff's claim of fraudulent inducement, but granted with respect to the remainder of plaintiff's claims.

## Discussion

### (1)

### Governing Standards and Law

When considering a motion to dismiss under Rule 12(b)(6), allegations in the complaint are accepted as true and all reasonable inferences are drawn in the plaintiff's favor. Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009). To survive a motion to dismiss, a plaintiff must allege "enough facts to

state a claim to relief that is plausible on its face." <u>Twombly</u>
<u>v. Bell Atl. Corp.</u>, 550 U.S. 544, 570 (2007).  Although normally
only a "short and plain statement" of a plaintiff's claim for
relief is required under the Federal Rules of Civil Procedure,
there is a heightened pleading requirement for claims of fraud.
<u>See</u> Fed. R. Civ. P. 8(a), 9(b).  Rule 9(b) requires that "[i]n
all averments of fraud or mistake, the circumstances
constituting fraud or mistake shall be stated with
particularity."

Both parties appear to agree that this software licensing
agreement should be categorized as a "good" and thereby governed
by Article 2 of New York's Uniform Commercial Code ("U.C.C.").[1]
<u>See</u> N.Y. U.C.C. § 2-102 (McKinney's 2010) (Article 2 applies to
"transactions in goods").  Case law confirms that this is
acceptable practice, although not a firmly established
conclusion.  <u>See</u> <u>Arbitron, Inc. v. Tralyn Broad., Inc.</u>, 400 F.3d
130, 138 & n.2 (2d Cir. 2005) ("It is not clear whether, under
New York law, a license agreement [for data or software] . . .

---

[1] Although the contract states that New Jersey law shall govern,
<u>see</u> Compl. Ex. C § 13.9, neither party argues that New Jersey
law should apply to any aspect of the instant dispute, and both
parties have briefed the motion under New York law.
Accordingly, New York law will be applied.  In any event, this
choice of law should have little import, given that "there is no
conflict between the laws of New York and New Jersey in regard
to . . . contract claims because both states adhere to the
Uniform Commercial Code."  <u>World Wide Tours of Greater NY, Ltd.</u>
<u>v. Parker Hannifin Customer Support, Inc.</u>, 07-CV-1007, 2008 WL
516676, at *3 n.2 (E.D.N.Y. Feb. 25, 2008).

constitutes a contract for the sale of goods, or is otherwise governed by the U.C.C."); Schroders, Inc. v. Hogan Sys., Inc., 137 Misc.2d 738, 741, 522 N.Y.S.2d 404, 406 (Sup. Ct. N.Y. County 1987) (finding that software licensing agreement fell "within the purview of Article 2 of the Uniform Commercial Code"); Commc'ns Groups, Inc. v. Warner Commc'ns, Inc., 138 Misc. 2d 80, 81-84, 527 N.Y.S.2d 341, 343-45 (N.Y.C. Civ. Ct. 1988) ("[I]t seems clear that computer software, generally, is considered by the courts to be a tangible, and movable item, not merely an intangible idea or thought and therefore qualifies as a 'good' under Article 2 of the UCC."); cf. Richard A. Rosenblatt & Co., Inc. v. Davidge Data Sys. Corp., 295 A.D.2d 168, 168, 743 N.Y.S.2d 471, 472 (1st Dep't 2002) (finding contract for computer hardware and software user rights to be a contract for the sale of goods).  Accordingly, plaintiff's warranty claims will be evaluated under U.C.C. Article 2.


**(2)**

**Breach of Warranty**

Defendant first argues that all of plaintiff's breach of warranty claims must be dismissed because the contract contains an explicit disclaimer of all warranties.  SK-HOV does not directly challenge the existence or scope of this disclaimer, but instead argues that the terms of the contract are

unconscionable, such that they should be discarded and the breach of warranty claims should be allowed to proceed.

U.C.C. Article 2 generally permits disclaimers of warranties that are adequately clear and conspicuous. The disclaimer here appears to meet all the necessary criteria for validity under the U.C.C.: it is in capital letters in a separate block paragraph and specifically mentions merchantability, fitness and that the software is being licensed "AS IS." See Compl. Ex. C § 7.2; see also Penn. Gas Co. v. Secord Bros., Inc., 73 Misc. 2d 1031, 1036, 343 N.Y.S.2d 256, 262 (Sup. Ct. Chautauqua County 1973) (explaining that disclaimers of warranties other than implied warranties of merchantability and fitness "need only be clearly stated to be proper contractual covenants"); N.Y. U.C.C. § 2-316 (disclaimer of implied warranty of merchantability must mention merchantability and must be conspicuous, and disclaimer of implied warranty of fitness "must be by a writing and conspicuous").

Nevertheless, even if a disclaimer meets these basic criteria, the U.C.C. separately provides that a court may void such a clause if it finds it "to have been unconscionable at the time it was made." N.Y. U.C.C. § 2-302.[2] "The determination of

---

[2] N.Y. U.C.C. § 2-302(1) provides in full:

unconscionability is a matter of law for the court to decide . .

. ." Industralease Automated & Scientific Equip. Corp. v.

R.M.E. Enters., Inc., 58 A.D.2d 482, 488, 396 N.Y.S.2d 427, 431

(2d Dep't 1977). The basic test for unconscionability, as laid

out in the Official Comment to section 2-302, is "whether, in

the light of the general commercial background and the

commercial needs of the particular trade or case, the clauses

involved are so one-sided as to be unconscionable under the

circumstances existing at the time of the making of the

contract." N.Y. U.C.C. § 2-302 cmt. 1.

To declare a contract clause unconscionable, New York

courts typically require "a showing that a contract is both

procedurally and substantively unconscionable when made."

Brower v. Gateway 2000, Inc., 246 A.D.2d 246, 253, 676 N.Y.S.2d

569, 573 (1st Dep't 1998) (internal quotation marks omitted);

see also Gillman v. Chase Manhattan Bank, N.A., 73 N.Y.2d 1, 10,

534 N.E.2d 824, 828, 537 N.Y.S.2d 787, 791 (1988).

"[P]rocedural unconscionability concerns the contract formation

process, while substantive unconscionability looks to the

---

        If the court as a matter of law finds the
        contract or any clause of the contract to
        have been unconscionable at the time it was
        made the court may refuse to enforce the
        contract, or it may enforce the remainder of
        the contract without the unconscionable
        clause, or it may so limit the application
        of any unconscionable clause as to avoid any
        unconscionable result.

content of the contract." Universal Leasing Servs., Inc. v. Flushing Hae Kwan Rest., 169 A.D.2d 829, 831, 565 N.Y.S.2d 199, 200 (2d Dep't 1991). Procedural and substantive unconscionability have been described as operating on a "sliding scale," meaning that "the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa." State v. Wolowitz, 96 A.D.2d 47, 68, 468 N.Y.S.2d 131, 145 (2d Dep't 1983).

In the instant case, as described below, plaintiff's claim of unconscionability fails because there is no procedural unconscionability alleged, and any potential substantive unconscionability is not, alone, egregious enough to render the contract unenforceable.

**a. Procedural Unconscionability**

Several factors contribute to the determination of whether a contract clause is procedurally unconscionable. These include "the size and commercial setting of the transaction, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power." Gillman, 73 N.Y.2d at 11 (internal citation omitted); see also Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 787 (2d Cir. 2003).

None of these factors support a finding of procedural unconscionability here. The contract at issue was struck between two organizations without any "deceptive or high-pressured tactics" alleged to have been employed. See Gillman, 73 N.Y.2d at 11. Nor is there any allegation that any "fine print" was utilized – as discussed above, the disclaimer of all warranties occurred in capital letters and was titled "LIMITED WARRANTY AND DISCLAIMER OF WARRANTY." Compl. Ex. C § 7.

Plaintiff's only potential pleading that might point towards procedural unconscionability is its statement that "SK-HOV at no time relevant had any expertise in computers, information technology or computer software." Compl. ¶ 9. However, SK-HOV at least entered the contract with a complex understanding, as set forth in its complaint, of exactly what "highly detailed and specific requirements" it needed its new software to be capable of performing, id. at ¶ 8, and thus had the knowledge necessary to allow it to make an informed decision. Cf. Jackson Heights Med. Group, P.C. v. Complex Corp., 222 A.D.2d 409, 410, 634 N.Y.S.2d 721, 722 (2d Dep't 1995) (rejecting a claim of unconscionability because plaintiffs "made no showing that they lacked a meaningful choice and did not freely consent to th[e] lease"). The fact that SK-HOV did not memorialize its specific needs in the contract is perhaps foolish, but does not point towards any procedural

unconscionability.[3]  This conclusion is only reinforced by the fact that SK-HOV does not even argue in its response papers that any procedural unconscionability was present, but instead urges holding the contract unenforceable based on substantive unconscionability alone.  As explained below, however, substantive unconscionability alone will not void the contract here.

**b. Substantive Unconscionability**

The inquiry into substantive unconscionability involves an analysis "of the substance of the bargain to determine whether the terms were unreasonably favorable to the party against whom unconscionability is urged."  Gillman, 73 N.Y.2d at 12. However, even a seemingly lopsided bargain is rarely enough, on its own, to void a contract's terms.  It is only in "exceptional cases where a provision of the contract is so outrageous" that a contract might be rendered "unenforceable on the ground of substantive unconscionability alone."  Id.; see also Wolowitz,

---

[3] Defendant further argues that procedural unconscionability is lacking because plaintiff clearly had negotiating power. Defendant points to a "tracked change" present in the contract, which changed the days in which payment was to be made from 30 to 60, as evidence that plaintiff had bargaining power that it employed to alter the terms of the contract.  This "tracked change" does appear in the version of the contract annexed to SK-HOV's complaint.  Compl. Ex. C § 8.7.  However, because it is not clear that this term was changed at plaintiff's demand, this fact will not be considered as part of the reason for rejecting plaintiff's claim of unconscionability.

96 A.D.2d at 68 ("While there may be extreme cases where a contractual term is so outrageous and oppressive as to warrant a finding of unconscionability irrespective of the contract formation process, such cases are the exception. Generally, there must be a showing of both a lack of a meaningful choice and the presence of contractual terms which unreasonably favor one party." (internal citation omitted)).  Because any contract "essentially involves a bargained-for exchange between the parties . . . . [a]bsent some violation of law or transgression of a strong public policy, the parties to a contract are basically free to make whatever agreement they wish, no matter how unwise it might appear to a third party."  Wolowitz, 96 A.D.2d at 68.

This case presents a situation where it can be said, as a matter of law, that the bargain struck between the parties is not unenforceable as substantively unconscionable.  Disclaimers of warranties are commonplace and explicitly permitted by the U.C.C.  See § 2-316; Siemens Credit Corp. v. Marvik Colour, Inc., 859 F. Supp. 686, 695 (S.D.N.Y. 1994) ("Contract terms waiving implied warranties . . . are not uncommon, and New York courts have held that waivers of claims are not against public policy.").  Additionally, looking at the bargain at the time it was struck, there is simply no reason to conclude that it was "so grossly unreasonable or unconscionable in light of the mores

and business practices of the time and place as to be unenforceable according to its literal terms." _Gillman_, 73 N.Y.2d at 10. To the contrary, numerous New York decisions have found disclaimers of warranties not to be unconscionable absent procedural flaws in the contractual process. _See, e.g._, _Preferred Capital, Inc. v. Halkios Rest. Corp._, No. 2003-1423, 2004 WL 1489510, at *1 (Sup. Ct. App. T. 2d Dep't June 22, 2004) (refusing to invalidate disclaimer of warranties as unconscionable even though machine "did not work and was useless" because defendants "made no showing that they lacked a meaningful choice to enter into the contract and that they did not freely consent to the sales contract"); _see also_ _Jackson Heights Med. Group_, 222 A.D.2d at 410 (finding disclaimer of warranties not unconscionable as a matter of law when "plaintiffs . . . made no showing that they lacked a meaningful choice and did not freely consent to [the] lease"); _Master Lease Corp. v. Manhattan Limousine, Ltd._, 177 A.D.2d 85, 91, 580 N.Y.S.2d 952, 955 (2d Dep't 1992) (same). The fact that this contract's complete disclaimer of warranties has ended up having harsh consequences, leaving SK-HOV powerless to ensure the quality of the EI software it licensed, cannot change the conclusion that the disclaimer here is enforceable as part of the bargain struck between the parties at the time they entered the contract.

SK-HOV also makes reference to N.Y. U.C.C. § 2-719 in arguing that the contract should be held unconscionable. Section 2-719 allows parties to limit the remedies that would otherwise be provided by the U.C.C. in the event of a breach, and further provides that where such an exclusive or limited remedy "fail[s] of its essential purpose," a party may resort to any remedy available under the U.C.C. See § 2-719(2).

However, this section does not help plaintiff because SK-HOV is not seeking remedies for a breach of the contract. Indeed, it appears that SK-HOV cannot claim a breach of the contract because under the severe terms of the bargain it struck to take the software "as-is," flaws in the software do not amount to a breach. Thus, section 2-719, which specifically addresses the quantum of remedies that must be available in the event of a breach, is inapposite. In point of fact, the comments to the U.C.C. itself make it clear that section 2-719 does not diminish the ability of sellers to disclaim warranties. See N.Y. U.C.C. § 2-719 cmt. 3 ("The seller in all cases is free to disclaim warranties in the manner provided in § 2-316."); Brampton Textiles, Ltd. v. Argenti, Inc., 162 A.D.2d 314, 314, 556 N.Y.S.2d 647, 647 (1st Dep't 1990) (finding a disclaimer of all warranties valid because "[w]hile a contract for the sale of goods, by virtue of [section 2-719], must provide a fair quantum of remedies for breach, nothing in that section precludes

parties to a contract from . . . excluding implied warranties").
Accordingly, section 2-719 does not aid SK-HOV's claims that the
disclaimer of warranties here should be found unenforceable.

In sum, given no claims of unequal bargaining power,
deceptive tactics or other procedural irregularities, there is
no valid ground on which the disclaimer of warranties at issue
here might be found unconscionable.  Regrettably for SK-HOV, it
explicitly assumed the contractual risk of imperfect software
when it agreed to take the software "as is," with no warranties
as to how it would perform.  Cf. Dallas Aerospace, Inc. v. CIS
Air Corp., 352 F.3d 775, 788 (2d Cir. 2003) (refusing to find
unconscionability in the case where a party "ended up with a
contract it [did] not like" as a result of "its own failure to
complete an adequate inquiry into [a product] it agreed to
accept in an 'AS-IS' 'WHERE-IS' condition") (internal quotation
marks omitted).  As a result, plaintiff's breach of warranty
claims must be dismissed.


### (3)

### Violation of General Business Law § 349

Defendant next moves to dismiss plaintiff's claim that
ProviderSoft's conduct violated New York General Business Law
§ 349, which prohibits "[d]eceptive acts or practices in the
conduct of any business, trade or commerce or in the furnishing

of any service. . . ."  N.Y. Gen. Bus. Law § 349(a).  Defendant

argues that this provision is inapplicable because the dispute

here is not "consumer oriented," but rather a private contract

dispute.

The threshold test developed by New York courts for

applicability of section 349 is whether or not the conduct of

which a plaintiff complains is "consumer oriented."  Shapiro v.

Berkshire Life Ins. Co., 212 F.3d 121, 126 (2d Cir. 2000).  This

requirement exists because "section 349 is directed at wrongs

against the consuming public."  Oswego Laborers' Local 214

Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 24, 647

N.E.2d 741, 744, 623 N.Y.S.2d 529, 532 (1995).  Including this

threshold requirement thus protects businesses from a "tidal

wave of litigation . . . that was not intended by the

Legislature."  Id. at 26.

In accordance with this purpose, a plaintiff proceeding

under section 349 "must demonstrate that the acts or practices

[complained of] have a broader impact on consumers at large."

Id. at 25.  Consumers in this context are defined as "those who

purchase goods and services for personal, family or household

use."  Sheth v. N.Y. Life Ins. Co., 273 A.D.2d 72, 73, 709

N.Y.S.2d 74, 75 (1st Dep't 2000).  Consequently, although the

"statute's consumer orientation does not preclude its

application to disputes between businesses per se ... it does

severely limit it." <u>Cruz v. NYNEX Info. Res.</u>, 263 A.D.2d 285, 290, 703 N.Y.S.2d 103, 107 (1st Dep't 2000). "Private contract disputes, unique to the parties, . . . would not fall within the ambit of the statute." <u>Oswego</u>, 85 N.Y.2d at 24.

Under these standards, it has repeatedly been held that when the activity complained of involves the sale of commodities to business entities only, such that it does not directly impact consumers, section 349 is inapplicable. <u>See</u> <u>Cruz</u>, 263 A.D.2d at 291 (finding that because product was, "by definition, a commodity available to businesses only, and plaintiffs fail[ed] to show how the complained-of conduct might either directly or potentially affect consumers, such conduct [did] not fall within the parameters of the statute"); <u>see also</u> <u>U.W. Marx, Inc. v. Bonded Concrete, Inc.</u>, 7 A.D.3d 856, 858, 776 N.Y.S.2d 617, 620 (3d Dep't 2004) (rejecting section 349 claim because "[n]o alleged act of defendant was 'directed at the consuming public,' and although defendant's alleged breaches many have had some tangential effect on members of the public . . . factual allegations of broad, consumer-oriented deceptive conduct are simply lacking" (internal citations omitted)); <u>Sheth</u>, 273 A.D.2d at 72 (dismissing section 349 claim because the challenged practices were directed only at prospective insurance agents and were not alleged to have "a broader impact on the consumer at large"); <u>Spirit Locker, Inc. v. EVO Direct</u>, 09-CV-1582, 2010 WL

1006561, at *5-7 (E.D.N.Y. March 19, 2010) (dismissing section 349 claim where defendant marketed credit card processing service only to businesses and collecting further cases holding that "though businesses may sometimes bring § 349 claims, they may do so only where the defendant's deceptive conduct is, at least to some extent, directed at non-business consumers").

Turning to the instant dispute, the conduct SK-HOV complains of does not qualify as "consumer oriented." Although SK-HOV alleges that this case involves a standard-issue contract, a relatively small amount of money and parties of differing expertise, none of these allegations suffices to bring its claim of deceptive practices within the ambit of section 349. See Cruz, 263 A.D.2d at 291 (finding none of these factors dispositive when conduct alleged simply did not involve consumers). SK-HOV's claims all center on ProviderSoft's inadequate provision of EI software, which is software specifically designed for "early intervention agencies," not for consumers. See Compl. ¶ 10 and Ex. A. Moreover, the limited functionality of the software means that there is virtually no chance that the software would be marketed to, or used by, consumers.

Although SK-HOV might argue that as a not-for-profit corporation, it is not a typical business entity and is somehow closer to the average consumer, this fact does not appear to

help its section 349 claim.  In Oswego, the New York Court of
Appeals considered whether fraudulent conduct perpetrated on two
not-for-profit pension funds constituted consumer-oriented
conduct.  85 N.Y.2d at 26.  It ultimately found that it did, but
not because of the funds' not-for-profit status; rather, it
deemed the fraud perpetrated against them consumer oriented
because "defendant Bank dealt with [the Pension Funds']
representative as any customer entering the bank to open a
savings account, furnishing the Funds with standard documents
presented to customers upon the opening of accounts."  Id.  By
implication, then, had the accounts in question been marketed
only to not-for-profit pension funds, the conduct would not have
been consumer oriented.  Extending this analysis, marketing a
software product only to a subset of not-for-profit corporations
does not qualify as consumer-oriented conduct.

Accordingly, SK-HOV has failed to allege that
ProviderSoft's conduct was consumer oriented and its claim under
N.Y. Gen. Bus. Law § 349 must be dismissed.


**(3)**

**Tort Claims and the Economic Loss Doctrine**

Defendant next argues that plaintiff's claims of strict
liability, gross negligence and negligence are all barred by New
York's economic loss doctrine.  Under this doctrine, New York

does not permit recovery through tort actions for damages that result from the poor performance of a contracted-for product. See Hodgson, Russ, Andrews, Woods & Goodyear, LLP v. Isolatek Int'l Corp., 300 A.D.2d 1051, 1052, 752 N.Y.S.2d 767, 769 (4th Dep't 2002) ("[A] plaintiff may not recover in tort against a manufacturer for economic loss that is contractually based, whether due to injury to the product itself or consequential losses flowing therefrom." (internal quotation marks omitted)). In contrast, however, tort recovery is allowed for personal injuries and damage to "other property." See Praxair, Inc. v. Gen. Insulation Co., 611 F. Supp. 2d 318, 326 (W.D.N.Y. 2009) ("The economic loss doctrine does not apply where a defective product causes damage to 'other property.'"); Bocre Leasing Corp. v. General Motors Corp. (Allison Gas Turbine Div.), 84 N.Y.2d 685, 692, 645 N.E.2d 1195, 1198, 621 N.Y.S.2d 497, 500 (1995) (explaining that tort liability is "generally present" when "personal injury and other property damage" are at issue).

The rationale behind the economic loss doctrine is that economic losses resulting from a defective product are best treated under the law of contracts, not tort. This is because "[t]he particular seller and purchaser are in the best position to allocate risk at the time of their sale and purchase, and this risk allocation is usually manifested in the selling price." Bocre, 84 N.Y.2d at 688; see also Hemming v.

<u>Certainteed Corp.</u>, 97 A.D.2d 976, 976, 468 N.Y.S.2d 789, 790

(4th Dep't 1983). Concordantly, when a purchaser chooses to

forgo "protecting itself with UCC warranties," it "should not be

permitted to fall back on tort when it has failed to preserve

its remedies." <u>Bocre</u>, 84 N.Y.2d at 689 (internal marks

omitted). Therefore, in <u>Bocre</u>, the New York Court of Appeals

refused to let the purchaser of a damaged helicopter proceed

under tort theories, because it had specifically contracted to

take the helicopter "AS IS" and thus "eschewed the very

protections that are designed to shelter a purchaser from

[losses resulting from product defects]." <u>Id.</u>[4]

Applying the economic loss doctrine to the current dispute,

defendant is correct that plaintiff's tort claims are barred.

Plaintiff seeks to recover "consequential damages . . . arising

from the flawed and defective software [defendant] licensed to

the plaintiff," and specifies that "flaws in defendant's

software" resulted in late bills, improperly submitted bills,

lost bills and double-billing. Compl. ¶ 39. But all of these

economic harms flow directly from the alleged defects in

---

[4] SK-HOV argues that <u>Bocre</u> should be limited to its facts and is
distinguishable because it involved a dispute between a
manufacturer and a four-times removed downstream purchaser.
Pl.'s Mem. Opp. Mot. Dismiss ("Pl.'s Mem.") at 9-10. However,
New York courts have specifically declined to find this
distinction meaningful and have consistently applied <u>Bocre</u> "in
cases involving more immediate purchasers." <u>7 World Trade Co.
v. Westinghouse Elec. Corp.</u>, 256 A.D.2d 263, 264-65, 682
N.Y.S.2d 385, 387 (1st Dep't 1998) (collecting cases).

defendant's software, and plaintiff agreed to assume the risk of these defects when it accepted the software "AS IS." Cf. Bocre, 84 N.Y.2d at 689; see also Fanok v. Carver Boat Corp., LLC, 576 F. Supp. 2d 404, 413 (E.D.N.Y. 2008) (refusing, in a case where plaintiff had disclaimed all warranties when purchasing a yacht, to allow the plaintiff to proceed under tort theories, because "[a]llowing plaintiff to claim that the yacht was somehow non-conforming to the contract because it had a design or manufacturing defect that caused it to malfunction would be to circumvent the warranty exclusion, and thus eviscerate the contractual bargain that the parties made").

SK-HOV responds to Providersoft's arguments first by pointing out that courts occasionally have permitted purely economic losses to be recovered under tort theories. In support of this position, SK-HOV primarily cites Hodgson, 300 A.D.2d at 1051. However, SK-HOV seems to miss the critical nuance of Hodgson: the precise reason why economic damages were held recoverable in Hodgson is because "the damages sought were not the result of the failure of the product to perform its intended purpose . . . ." Id. at 1052-53. In contrast, the defect alleged here is "materially non-functional billing software"; in other words, a failure of the product to perform its intended function. Pl.'s Mem. at 7-8; see also Compl. ¶ 14 ("[T]he defendant's software was woefully inadequate to the tasks for

which defendant's software was licensed."). All of the damages SK-HOV alleges are consequential damages flowing from this non-functional billing software, and, accordingly, cannot be recovered under a tort claim. See World Wide Tours, 07-CV-1007 2008 WL 516676, at *3 (E.D.N.Y. Feb. 25, 2008) (citing Bocre for the proposition that consequential losses "flowing from" injury to contracted-for property were barred by the economic loss doctrine).

Thus, proceeding under a "Hodgson-like analysis," as plaintiff suggests, still leads to the conclusion that plaintiff's tort claims are barred. Nor are the other cases plaintiff cites in this vein any more availing. See Adirondack Combustion Techs., Inc. v. Unicontrol, Inc., 17 A.D.3d 825, 827, 793 N.Y.S.2d 576, 578-79 (3d Dep't 2005) (explaining that plaintiff could seek a tort remedy because plaintiff sought to recover for damages sustained to other property, not defendant's controller device); Arkwright Mut. Ins. Co. v. Bojoirve, Inc., 93-CV-3068, 1996 WL 361535, at *3 (S.D.N.Y. June 27, 1996) (allowing tort claims against manufacturer of defective governor to proceed because the governor damaged not only itself, "but also adjacent generators, floors, ceilings, furniture and other items of real and personal property . . . ." (internal quotation marks omitted)); Flex-O-Vit USA, Inc. v. Niagara Mohawk Power Corp., 292 A.D.2d 764, 767, 739 N.Y.S.2d 785, 787 (4th Dep't

2002) (finding claim not barred by the economic loss doctrine specifically because "[p]laintiff's alleged damages [did] not arise from the failure of the ventilation fan to perform as intended" (internal marks omitted)); Triple R Farm P'ship v. IBA, Inc., 21 A.D.3d 1260, 1261, 801 N.Y.S.2d 666, 668 (4th Dep't 2005) (apparently, though without much discussion, concluding that plaintiff could recover "for injury to property" because its cows – i.e., separate property – were harmed by a defective product).

Plaintiff briefly advances two additional theories as to why its tort claims should not be barred by the economic loss doctrine. First, it believes its claims should be saved by the exception to the economic loss doctrine that exists for contracts for the provision of services. This exception has been recognized by several courts applying New York law, though called into question by others. See Am. Tel. & Tel. Co. v. New York City Human Res. Admin., 833 F. Supp. 962, 983 (S.D.N.Y. 1993) ("[A]n exception to the economic loss rule exists, under limited circumstances, for claims for negligent performance of contractual services."); see also Ajax Hardware Mfg. Corp. v. Indus. Plants Corp., 569 F.2d 181, 185 (2d Cir. 1977) (explaining, in considering a service contract, that "[n]egligent performance of a contract may give rise to a claim sounding in tort as well as one for breach of contract"). But

see Joseph v. David M. Schwarz/Architectural Servs., P.C., 957 F. Supp. 1334, 1340-41 (S.D.N.Y. 1997) ("In opposition to these decisions, there is a substantial line of authority which squarely rejects the service/goods dichotomy, and which adopts a blanket rule against negligence suits where only economic loss is at stake."), abrogated in part by Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 18 (2d Cir. 2000).

Even accepting that an exception exists for service contracts, such exception is inapplicable here. The distinction between goods contracts and service contracts turns on whether the transaction, taken as a whole, is "deemed to be a sale of goods, and thus falls within U.C.C. article 2;" or is "deemed to be predominantly service oriented," in which case "the case falls outside U.C.C. article 2 and plaintiff would have no cause of action for breach of implied or express warranties but would have a cause of action for negligence." Word Mgmt. Corp. v. AT & T Info. Sys., Inc., 135 A.D.2d 317, 321, 525 N.Y.S.2d 433, 435-36 (3d Dep't 1988). Here, although SK-HOV points to some sections of the contract that require provision of ancillary services, the contract clearly is primarily one for provision of software. Indeed, with respect to its breach of warranty claims, plaintiff argues that the contract should be treated as a contract for goods and therefore governed by U.C.C. Article 2. See Compl. ¶ 20. The fact that some maintenance and support

27

services are included in the contract does not change the conclusion that it is not "predominantly service oriented."  See Word Mgmt. Corp., 135 A.D.2d at 321 (finding negligence claim barred by the economic loss doctrine because although "some service was involved" in the contract, the primary contract was one for a system sold to plaintiff to perform data transmitting functions); see also Am. Tel. & Tel. Co., 833 F. Supp. at 983-84 (finding that contract that included "incidental" installation services was still one for the sale of goods, and thus barring the plaintiff's tort claims under the economic loss doctrine).

Plaintiff also argues that the economic loss doctrine should be held inapplicable because there was an obvious, easily correctable design defect in defendant's software.  However, the cases plaintiff cites do not, in fact, support the proposition that such an exception to the economic loss doctrine exists. Rather, this obvious design defect exception has been applied in a different situation: to negate the affirmative "contract specification defense" otherwise available to a manufacturer "who assembled a product according to the plans and specifications in a contract with a buyer. . . ."  Amer. Ref-Fuel Co. of Niagara, LP v. Gensimore Trucking, Inc., 02-CV-814, 2007 WL 2743449, at *3 (W.D.N.Y. Sept. 18, 2007) (internal quotation marks omitted) (citing Ryan v. Feeney & Sheehan Bldg. Co., 239 N.Y. 43, 1145 N.E. 321 (1942); Munger v. Heider Mfg.

Corp., 90 A.D.2d 645, 456 N.Y.S.2d 371 (3d Dep't 1982); Kern v. Roemer Mach. & Welding Co., 820 F. Supp. 719 (S.D.N.Y. 1993)). None of these cases, however, presents a situation in which a claim for purely economic loss was allowed to go forward. To the contrary, as defendant correctly points out, all of these cases were proceeding under tort theories because they involved injuries to persons or other property. See Am. Ref-Fuel, 2007 WL 2743449, at *2; Munger, 90 A.D.2d at 645; Ryan, 239 N.Y. at 46-47; Kern, 820 F. Supp. at 720.

Accordingly, none of the exceptions to the economic loss doctrine argued by plaintiff can save its tort claims. Because plaintiff only seeks economic damages stemming from defects in the contracted-for software, its claims of negligence, strict liability and gross negligence must be dismissed as barred by New York's economic loss doctrine.


**(4)**

**Fraud in the Inducement**

Plaintiff's final claim is for fraud in the inducement. Specifically, plaintiff alleges that Providersoft's website and Providersoft representatives made numerous false statements regarding the EI software, which SK-HOV relied on in choosing to license the software. Compl. ¶¶ 47-51. Defendant believes this

claim must fail because it is based on inactionable puffing and is not pleaded with sufficient particularity.

Under New York law, a claim of fraudulent inducement requires an assertion of (1) the misrepresentation of a material fact, (2) known by the defendant to be false and intended to be relied upon when made and (3) justifiable reliance and resulting injury.  Braddock v. Braddock, 60 A.D.3d 84, 86, 871 N.Y.S.2d 68, 70 (1st Dep't 2009) (citing Gaidon v. Guardian Life Ins. Co., 94 N.Y.2d 330, 351, 725 N.E.2d 598, 608, 704 N.Y.S.2d 177, 187 (1999)).  When fraud is alleged to have induced a plaintiff to enter into a contract, the New York Court of Appeals has explained:

> Any statement of an existing fact material
> to the person to whom it is made that is
> false and known by the person making it to
> be false and which is made to induce the
> execution of a contract, and which does
> induce the contract, constitutes a fraud
> that will sustain an action to avoid the
> contract if the person making it is injured
> thereby.

Adams v. Gillig, 199 N.Y. 314, 319, 92 N.E. 670, 671 (1910); see also Fierro v. Gallucci, 06-CV-5189, 2008 WL 2039545, at *7-8 (E.D.N.Y. May 12, 2008) (quoting and reaffirming this rule from Gillig).

Defendant is correct that some of the statements of which plaintiff complains are no more than non-actionable puffing. Statements that are "expression[s] of opinion," rather than of

fact, have been labeled as "mere puffing" that cannot form the basis of a fraud claim.  See ESBE Holdings, Inc. v. Vanquish Acquisition Partners, LLC, 50 A.D.3d 397, 399, 858 N.Y.S.2d 94, 95-96 (1st Dep't 2008); see also Longo v. Butler Equities II, 278 A.D.2d 97, 97, 718 N.Y.S.2d 30, 31 (1st Dep't 2000).  In essence, a defense of "puffing" is an argument that "no reasonable person would believe some sales promotion to be literally true."  See Gaidon, 94 N.Y.2d at 357 (Bellacosa, J., dissenting in part).  Some of the statements plaintiff pleads fall within this category.  In particular, most of the statements plaintiff details from defendant's website are mere puffery, including promises that ProviderSoft EI was a "state of the art" interface that would provide compliance "at a previously unimaginable level."  Compl. ¶ 48.  Similarly, Providersoft representative Shaw's averments that the software was "great" and "foolproof" are nothing more than opinions and thus puffery.  Id. at ¶ 12.

However, other allegations in plaintiff's complaint detail misrepresentations that rise beyond the level of puffery and might constitute false statements of fact.  Specifically, the representation on defendant's website that the software provided "[c]ompliance alerts to providers and Administrators" can be construed as a factual statement about the software's capabilities.  Id. at ¶ 48.  Similarly, several statements

allegedly made by Shaw to plaintiff in and after August 2007

contain facts about Providersoft EI's functions, including

Shaw's representations that:

(1) The software "would be 100 % compliant with EI
    regulations regarding double billing";
(2) the software "offered billing protection, which would
    allow SK-HOV to bill only per mandate and not permit
    services or billings to go over mandate";
(3) the software "would red flag evaluations if not
    processed";
(4) the software "had an inactivity tracker which would send
    an alert if 3 sessions passed without billing"; and
(5) the software "had a platform for reconciliation of billed
    claims against paid claims."

Id. at ¶ 12.  Plaintiff has further alleged that all of these

statements about the software's capabilities were in fact false,

and that Shaw either knew of the falsity of these statements or

made them with reckless disregard for their truth.  Id. at ¶ 47.

At this stage, these allegations are sufficient to form the

basis of a fraudulent inducement claim.  Cf. Yuzwak v. Dygert,

144 A.D.2d 938, 939, 534 N.Y.S.2d 35, 36 (4th Dep't 1988)

(explaining that when a statement is not obviously puffing, the

question of whether it is fact or opinion is "almost always a

question of fact for a jury's resolution").

Defendant's final argument is that these statements, even

if not mere puffing, are not pled with sufficient particularity

under Fed R. Civ. Proc. 9(b).  Rule 9(b) requires a party

alleging fraud to "state with particularity the circumstances

constituting fraud . . . ."  To meet this burden, plaintiff must

"(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." Harsco Corp. v. Segui, 91 F.3d 337, 347 (2d Cir. 1996).

The complaint meets these basic requirements.  It explains the content of the allegedly fraudulent statements, identifies the speakers as Shaw and defendant's website, pinpoints that Shaw's statements took place at a meeting in August 2007 and subsequent meetings and explains that the false statements were made for the purpose of getting plaintiff to enter into a software license agreement.  See Compl. ¶¶ 10-13, 50; cf. Cornwell v. Credit Suisse Group, 08-CV-3758, --- F. Supp. 2d ---, 2010 WL 537593, at *5 (S.D.N.Y. Feb. 11, 2010) (finding that allegations met Rule 9(b)'s heightened pleading requirement "because they sufficiently specify when the misstatement or omission of material fact was made, by whom, and why it was fraudulent").  Accordingly, at this stage, plaintiff's claim of fraudulent inducement will be allowed to proceed.

## Conclusion

For the reasons stated above, defendant's motion to dismiss is granted with respect to plaintiff's claims of breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, breach of express warranty, violation of N.Y. Gen. Bus. Law § 349, negligence, gross negligence and strict liability. Defendant's motion to dismiss plaintiff's claim of fraudulent inducement is denied.


Dated: Brooklyn, New York
      May 21, 2010

                                      SO ORDERED:


                                    _____/s/_____

                                    David G. Trager
                                    United States District Judge